Robert V. BLACK, Jr., Petitioner–Appellant,

v.

James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellee.

No. 92–2375.

United States Court of Appeals, Fifth Circuit.

May 21, 1992.

Certiorari Denied June 15, 1992. See 112 S.Ct. 2983.

---

Raoul D. Schonemann, Virginia C. Lindsay, Texas Resource Center, Austin, Tex., Mandy Welch, Houston, Tex., for petitioner-appellant.

Dan Morales, Atty. Gen., Stephanie A. Stelmach, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before POLITZ, Chief Judge, KING, and EMILIO M. GARZA, Circuit Judges.

KING, Circuit Judge:

Robert V. Black, Jr., was convicted in a Texas court of hiring a man to kill his wife, Sandra Black, and sentenced to death. After exhausting his state remedies, Black filed a petition for a writ of habeas corpus in federal court. The district court denied relief on all claims, and refused to grant a certificate of probable cause to appeal. Black now applies to this court for a certificate of probable cause and moves for a stay of execution. We deny the application and the motion.

## I. FACTS AND PROCEDURAL HISTORY

In the fall of 1984, Black became acquainted with John Wayne Hearn when Black answered an advertisement Hearn had placed in *Soldier of Fortune* magazine. Hearn, who was involved in a group that was gathering weapons to send to the Nicaraguan contras, eventually became interested in purchasing Black's gun collection. Hearn and Black met in Texas in early 1985 to discuss the purchase. In the course of their meeting, Black told Hearn that he (Black) would have all the money he needed if he did not have a wife. Black described a plot he had concocted to kill his wife in which he and a friend would force a speeding car containing Sandra Black into a bridge embankment. The gun deal fell through, however, and Hearn returned to Florida.

Shortly thereafter, Black called Hearn to tell him that the friend was no longer willing to help in the murder plot. Black asked Hearn if he would assist him, and Hearn agreed. Hearn returned to Bryan, Texas on February 20, 1985, and Black promised to pay $10,000 plus expenses for Hearn's troubles. Hearn and Black eventually agreed that Hearn would shoot Sandra with her own pistol in Black's house. The next day, Hearn and Black ransacked the house to give the appearance of a burglary. Black and his son, Gary, ran errands while Hearn waited for Sandra to

return home. When Sandra returned, Hearn shot her twice in the head, killing her.

The evidence at trial showed that Black obtained a $100,000 insurance policy on Sandra's life eight days before the murder, thereby doubling the coverage on her life. The evidence also showed that Black had contemplated killing Sandra for several years prior to her murder, and had attempted to enlist the assistance of several people in carrying out his schemes. In 1982 or 1983, Black gave Mark Huber a "downpayment" on his offer of $5,000 for Huber's assistance. Black suggested that Huber help in shooting Sandra or running over her with a truck. In the fall of 1984, Black wanted to get rid of Sandra so that he could carry on a relationship with his first cousin, Teresa Hetherington. To this end, he had discussions with David Huber, Mark's brother, in which he (Black) suggested that David assist in burning Sandra to death. Black also suggested that David steal a truck and run over Sandra while she was riding her motorcycle, hit her on the head with a baseball bat and dump her over a bridge, or fake a robbery or rape and shoot Sandra with one of Black's guns. Black also discussed killing Sandra with Gordon Matheson. Matheson testified that Black hated Sandra and was obsessed with Teresa, and that Black had asked him to assist in killing Sandra by driving a car into which Black would crawl after guiding Sandra's car into a bridge embankment. Black offered both David Huber and Matheson monetary rewards for their help. Other testimony established that Black had discussed killing his girlfriend's husband.

After trial in February 1986, the jury found Black guilty of capital murder. Two special issues, "deliberateness" and "future dangerousness," were submitted for the punishment phase under the former version of the Texas Code of Criminal Procedure, article 37.071(b).[1] Black offered a great deal of evidence at the punishment phase. Witnesses testified that Black had not been a mean or vicious child and that he had won numerous honors in scouting as a young man, including the award of Eagle Scout. After studying chemical engineering at Texas A & M University for two years, Black dropped out to join the Marines. He received a Blues Award for being the distinguished Marine in his platoon, and he flew on over 100 combat missions in Vietnam. After his discharge from the service, Black returned to Bryan, where he worked sporadically. There was testimony from his coworkers at an electrical company that he had been a good electrician and a good worker. There was also testimony that he had been involved in the Boy Scouts with his son and that he had been helpful to a friend of his son who suffered from physical and emotional problems.

The State's evidence at the punishment phase consisted of the testimony of Mark Huber described above, the testimony of David Huber regarding Black's mention of wanting to kill Sandra and his girlfriend's husband, and the testimony of two other witnesses who stated that Black had expressed a desire to kill Sandra or his girlfriend's husband. Sandra's mother, Marjorie Eimann, testified that Black had thrown Sandra through a screen door during an argument approximately ten years earlier, and she also testified that Black had chased her (Eimann) from Black's home. In addition, a deputy sheriff from the Brazos County Jail testified that when Black was being held pending trial, a map of the jail

---

**1.** The jury was asked to determine the following:
(1) Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased would result?
(2) Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Tex.Code Crim.Proc.Ann. art. 37.071(b) (Vernon 1981). The Texas capital sentencing statute has since been amended, but the new procedures apply only to trials held after September 1, 1991. For discussion, see *Graham v. Collins*, 950 F.2d 1009, 1012 n. 1 (5th Cir.1992) (en banc), *cert. granted,* — U.S. —, 112 S.Ct. 2937, 119 L.Ed.2d 563 (1992).

and surrounding grounds and some wire were found during a shakedown. Grady Deckard, another inmate at the jail, testified that Black had told him of an escape plot. The jury answered both special issues in the affirmative, and Black was sentenced to death.

The Texas Court of Criminal Appeals affirmed the conviction, *Black v. State*, 816 S.W.2d 350 (Tex.Crim.App.1991), and Black did not seek certiorari review in the U.S. Supreme Court. One day before his scheduled execution, Black applied for a stay of execution and a writ of habeas corpus in the state trial court and Texas Court of Criminal Appeals. The Court of Criminal Appeals granted a stay. After Black amended his petition, the trial court held an evidentiary hearing on March 18–19, 1992. On April 7, the court entered findings of fact and conclusions of law and recommended that relief be denied. The court reset Black's execution for May 22. Black filed objections with the Court of Criminal Appeals and sought a stay, but the Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief. *Ex parte Black*, No. 22,919–02 (Tex.Crim.App. May 12, 1992).

Black then filed a petition for a writ of habeas corpus in federal court. He raised the following grounds for relief, all of which had been exhausted in state court:

1. His trial attorneys rendered constitutionally ineffective assistance by failing to investigate and offer for purposes of mitigation evidence that Black suffered from Post–Traumatic Stress Disorder at the time of the offense.

2. The Texas capital sentencing statute as applied in this case violated the Eighth Amendment because it precluded the jury from giving full consideration to his mitigating evidence of good acts and positive character traits.

3. His Sixth Amendment right to counsel was violated when evidence of a conversation he had out of the presence of counsel with a jailhouse informant, Grady Deckard, was admitted at trial.

4. The prosecution failed to reveal that Grady Deckard testified for the State in return for a promise of leniency, in violation of the Fourteenth Amendment.

5. Grady Deckard's testimony was false, thereby violating Black's rights under the Fourteenth Amendment.

6. The Texas capital sentencing statute as applied in this case violated his Sixth Amendment right to effective assistance of counsel because it prevented his counsel from presenting relevant and probative mitigating evidence.

7. The admission of evidence of unadjudicated offenses at the penalty phase violated his rights under the Eighth and Fourteenth Amendments.

8. The State presented inflammatory evidence and argument concerning the character and worth of the victim, in violation of the Fourteenth Amendment.

9. The trial court's failure to grant a motion to change venue violated his rights under the Fourteenth Amendment.

Black also moved for an evidentiary hearing on claims 1, 3 and 4, asserting that the factual findings underlying those claims that had been made in the state habeas proceeding were not entitled to the presumption of correctness under 28 U.S.C. § 2254(d). The district court denied all relief, denied the motion for an evidentiary hearing, and denied a certificate of probable cause to appeal. *Black v. Collins*, No. H–92–1507, (S.D.Tex. May 19, 1992) [hereinafter Dist.Ct.Op.]. Black has filed with this court an application for a certificate of probable cause to appeal and a motion for a stay of execution scheduled for May 22, 1992.

## II. DISCUSSION

### A. *Certificate of Probable Cause to Appeal*

■ We have no jurisdiction to hear an appeal in this case unless we first grant a certificate of probable cause. Fed. R.App.P. 22(b). To obtain a CPC, Black must "make a 'substantial showing of the denial of [a] federal right.'" *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983) (quoting *Stewart v. Beto*, 454 F.2d 268, 270 n. 2 (5th Cir.1971), *cert. denied*, 406 U.S. 925, 92 S.Ct. 1796, 32 L.Ed.2d 126 (1972)); *Jones v.*

*Whitley,* 938 F.2d 536, 539 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 8, 115 L.Ed.2d 1093 (1991). To sustain this burden, Black "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'" *Barefoot,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4 (quoting *Gordon v. Willis,* 516 F.Supp. 911, 913 (N.D.Ga.1980)) (emphasis in *Gordon;* brackets in *Barefoot*). Although an appellate court may consider the fact that the penalty is death when deciding whether to grant a CPC, this alone does not warrant the automatic issuance of a CPC. *Barefoot,* 463 U.S. at 893, 103 S.Ct. at 3394; *White v. Collins,* 959 F.2d 1319 (5th Cir. 1992).

Black's application for a certificate of probable cause focuses on only two of the issues that he raised in federal district court. First, he argues that he presents a claim under *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and *Graham v. Collins,* 950 F.2d 1009 (5th Cir.1992) (en banc), *cert. granted* —— U.S. ——, 112 S.Ct. 2937, —— L.Ed.2d —— (1992), when he alleges that the mitigating evidence showing his positive contributions to society and his good character prior to his service as a Marine in Vietnam, and to a lesser extent after his service in Vietnam, could not be fully considered under either of the two special issues answered by the jury. Second, Black argues that his appeal raises serious questions concerning the district court's deference to the state court's decision with respect to his ineffective assistance of counsel claim. Essentially Black argues that both issues are debatable among jurists of reason and that the issues deserve further development. For the reasons hereinafter set forth, we disagree. We address in some detail the two issues noted in Black's application for a certificate of probable cause. Although we are not obligated to do so, we also address the other issues raised by Black in the district court.

### B. *Evidentiary Hearing and the Presumption of Correctness of State Court Findings*

■ Black argued in the federal district court that he was entitled to an evidentiary hearing because material facts remained in dispute and the state court did not hold a full, fair and adequate hearing. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963), *overruled in part on other grounds, Keeney v. Tamayo-Reyes,* —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). He also levelled a general challenge to the state court's findings of fact, arguing that four of the exceptions to the presumption of correctness enumerated in § 2254(d) were applicable.[2]

**2.** 28 U.S.C. § 2254(d) provides, in relevant part:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided

The circumstances listed in *Townsend* under which federal evidentiary hearings must be held are nearly identical to the circumstances under which federal habeas courts do not defer to state court findings of fact, and, although the two issues are distinct, *Keeney v. Tamayo–Reyes,* — U.S. —, — n. 5, 112 S.Ct. 1715, 1720–21 n. 5, 118 L.Ed.2d 318 (1992), we have recognized that a federal court's determination that a § 2254(d) exception applies will entitle a petitioner to an evidentiary hearing. *Buxton v. Lynaugh,* 879 F.2d 140, 143 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990). Conversely, a finding that one of the § 2254(d) exceptions does *not* apply should normally preclude the necessity for an evidentiary hearing, because the prerequisites of *Townsend* will not have been satisfied.

Black's challenges to the findings can be grouped into two categories: those based on the inadequacy of the procedures or other aspects of the state hearing (exceptions under § 2254(d)(2), (d)(6) and (d)(7)) and those based on alleged insufficiency of the evidence in support of particular findings (the exception under § 2254(d)(8)). The first category, which we discuss in this section, requires us to determine whether procedural irregularities at the hearing rendered the presumption inapplicable. *E.g., Buxton,* 879 F.2d at 143 (analyzing whether state court's failure to hold a live evidentiary hearing renders state procedures inadequate within meaning of § 2254(d)(2)). The second category, which we discuss in connection with Black's specific constitutional claims, requires us to examine the

state record to determine whether the evidence fairly supports the state court's conclusions. *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983).

■ Black's objection to the adequacy of the state court hearing centered on the court's exclusion of 11 exhibits. As detailed in his motion papers, these documents include medical, psychiatric and school records which formed the basis of the testimony and conclusions of two expert witnesses; records of the Brazos County Jail; letters written by Grady Deckard to his attorney; the affidavit of a man with whom Black served in Vietnam who supposedly would have testified to Black's post-Vietnam troubles; Black's medical records while under the care of Dr. David Segrest; and the Brazos County District Attorney's file on Grady Deckard.[3]

The court's basis for excluding each exhibit was either that it lacked relevance or was hearsay. The court gave Black's attorneys an opportunity to redact the inadmissible portions of each document and resubmit them, but they did not do so. Under these circumstances, we cannot conclude that Black did not receive a full, fair and adequate hearing. The Texas Rules of Criminal Evidence, like the Federal Rules of Evidence, provide that neither irrelevant evidence nor hearsay evidence is admissible. Tex.R.Crim.Evid. 402 (relevance), 802 (hearsay). Having reviewed the state court's evidentiary rulings,[4] we cannot conclude that that court's decision to exclude

for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record....

3. Black contended that the exclusion of these exhibits rendered the hearing unfair, triggering the (d)(2) and (d)(6) exceptions, and further contended that the state court's refusal to grant discovery constituted a denial of due process of law which triggers the (d)(7) exception.

4. For example, the court excluded letters allegedly written in January 1986 by Grady Deckard to his attorney, Brooks Cofer, on the ground that they were hearsay. Black maintains that

the letters show Deckard deliberately elicited statements from Black after Deckard became an agent of the State, so that the introduction of Deckard's testimony about the statements violated Black's Sixth Amendment right to counsel. Deckard's testimony at the punishment phase had indicated that Black's statements were made *before* Deckard became an agent of the State. At the state habeas hearing, Deckard recanted his testimony; Black therefore argued that the letters were admissible as a prior statement offered to rebut a charge of recent fabrication, Tex.R.Civ.Evid. 801(e)(1)(B). As the State pointed out prior to the court's ruling, however, the fact that Deckard recanted was not the same as a charge by the State that he recently fabricated testimony.

the 11 exhibits under rules of evidence that are identical to those that would apply in a federal habeas corpus hearing detracts from the fairness of the proceedings.

### C. *Ineffective Assistance of Counsel*

■ Black alleges that his appointed attorneys, Robert Scott and Keith Swim, unreasonably failed to investigate his complex of mental disorders, and that this caused them unreasonably to fail to present highly probative mitigating evidence at the penalty phase. He further contends that, had his attorneys presented evidence of his multiple impairments, principally the fact that he suffered from Post–Traumatic Stress Disorder (PTSD) as a result of his service in Vietnam, there is a reasonable probability that he would have received a life sentence.

■ We review a claim of ineffective assistance of counsel at a capital sentencing trial under the familiar standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing the time counsel rendered assistance. *Id.* at 688, 104 S.Ct. at 2064. This is a standard which requires us to be "highly deferential," as it is extremely difficult for reviewing courts to place themselves in counsel's position and evaluate the choices he or she should have made. The range of attorney conduct that must be considered reasonable is thus quite wide, and our inquiry must focus on the particular decisions an attorney made in light of all the circumstances. *Id.* at 689–90, 104 S.Ct. at 2065–66. This standard applies no less to an attorney's duty to investigate than to the other duties associated with trial: "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct.

at 2066. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. A court evaluating a claim of ineffective assistance need not address the reasonableness component first, and if a defendant fails on one part it need not address the other. *Id.* at 697, 104 S.Ct. at 2069.

■ The Court in *Strickland* also set forth important guidelines for federal habeas review of the factual and legal issues that arise in ineffective assistance claims. Contrary to what the federal district court appears to have thought, a state court's ultimate conclusion that counsel rendered effective assistance is not a fact finding to which a federal habeas court must grant a presumption of correctness under 28 U.S.C. § 2254(d), but instead is a mixed question of law and fact. However, any subsidiary factual findings made by a state court in the course of determining that effective assistance was rendered is entitled to the § 2254(d) presumption. *Id.* at 698, 104 S.Ct. at 2070; *Loyd v. Smith,* 899 F.2d 1416, 1425 (5th Cir.1990).

Post–Traumatic Stress Disorder describes a pattern of behavior induced by unusually stressful or traumatic life events. Frequently seen in veterans of combat, its symptoms may include forms of re-enactment of the stressful experience or avoidance of reminders or memories of the painful aspects of the experience. It may cause physiological changes which result in increased irritability, anger, sleep disturbance and memory and concentration problems, and it may induce aggression, hostility, anger and violent outbursts.

The state court took a great deal of testimony on the question whether Black's attorneys were ineffective for failing to investigate and present evidence of the fact that Black suffered from PTSD and other psychological disorders, and made extensive findings. The findings, which Black does not argue are unsupported by the

evidence, include the following: James Leitner, a Houston attorney who was retained by Black's parents and represented Black before formal charges were filed, arranged for Dr. John Walker to conduct a psychiatric examination of Black. Leitner subsequently withdrew from representing Black, and Scott and Swim were appointed. Leitner communicated with Scott about the investigation he had performed and indicated that Black had undergone a psychiatric examination.[5] Scott was aware from his discussions with Leitner that a psychiatric examination had been conducted and that Black had been diagnosed as suffering from PTSD, but Leitner told Scott that the disorder did not "fit the facts and circumstances of [Black's] case because of the contractual arrangements [for the murder of Sandra] and [Black's] discussions with other people about hiring someone to murder Sandra Black." Scott was aware of the fact that Black had employment and marital troubles since returning from Vietnam, and was aware of Black's unpredictable and often violent behavior. Scott also learned that Black had been hospitalized following his return from Vietnam and that he had been diagnosed on those occasions as suffering from depression and PTSD. Moreover, Scott did some reading about PTSD in an effort to determine whether it could serve as a viable defense. Since Black does not challenge these findings, they are presumed correct here.

Black strongly disputes the state court's finding that Scott made a strategic, tactical decision not to offer evidence of PTSD at the punishment phase after considering what he knew about the disorder and the circumstances of the case. The court found that Scott decided to present a theo-

ry of the murder as a one-time event which was not the mark of a person who would be dangerous in the future. To this end, Scott introduced evidence of Black's positive character traits and accomplishments throughout his life. Evidence of PTSD would have indicated a person who was likely to have violent outbursts in the future, Scott thought, and there appeared to be no connection between the explosive behavior marking PTSD and the calculated nature of the crime. Thus, Scott decided to keep from the jury evidence which in his estimation would only have had a negative impact on the second special issue. Black contends that these findings are erroneous: Scott could not have made a "strategic" decision because his testimony shows that he was completely unaware of the evidence necessary to support a defense which would have fully developed his complex of mental disorders (of which PTSD was only one) and would have fully explained the relationship between those disorders and his erratic and destructive behavior in his post-Vietnam years, including the murder of his wife. Such a defense, Black argues, would have included evidence that his psychological disorders are treatable, bearing favorably on the question of his future dangerousness. This objection, however, goes to the *reasonableness* of Scott's investigation and trial strategy, not to the purely historical facts that Scott made particular decisions.[6] The court's findings of fact about Scott's strategy are amply supported by the record, and therefore are entitled to deference.

On the basis of the findings described above, the state court concluded that Black's trial attorneys were not ineffective for failing to present evidence of PTSD at

---

**5.** Leitner did not testify to the substance of his conversations with Scott because these were protected by Black's attorney-client privilege with Leitner. The privilege did not apply to Scott, however, because his former client was charging him with ineffective assistance.

**6.** As may be inevitable where the ultimate issue is a mixed question of law and fact, some of the state court's factual findings resemble legal conclusions. For example, Black disputes the court's finding that "[e]vidence of Post-Traumatic Stress Disorder would have been incon-

sistent with Robert Scott's defensive theory." This finding involves a judgment about the propriety of using a particular species of evidence, and thus is not strictly a finding on an issue of "basic, primary, or historical fact[ ]." *Townsend,* 372 U.S. at 309 n. 6, 83 S.Ct. at 755 n. 6.

That the state court interspersed legal conclusions with factual findings in no way detracts from the fairness or adequacy of the hearing. It merely requires us to identify with some precision the findings to which we defer and the conclusions which we will review de novo.

the guilt-innocence or punishment phases of the trial. The federal district court, too, ultimately concluded that Black failed to show that his trial counsel rendered ineffective assistance.[7] Dist.Ct.Op. at 7. Contrary to the picture Black attempts to paint of trial attorneys who made strategic decisions using only the barest knowledge of Black's mental afflictions, we are of the view that Scott's knowledge of Black's condition was sufficient to render reasonable the decision to limit any investigation of a defense based on multiple psychological disorders and to restrict the punishment phase evidence to "good character" evidence. As Black concedes in his habeas petition, "trial counsel was aware of substantial information that established that Mr. Black suffered from a mental disability that had dramatically impaired his functioning since his return from Southeast Asia." Even more importantly, Scott was aware that the psychological evaluation performed by Dr. Walker had indicated that Black suffered from PTSD. Black faults Scott for failing to familiarize himself with Dr. Walker's evaluation, but Scott's testimony indicates that he was aware of the essential contents of the report—the diagnosis of PTSD. Scott's testimony reveals that, far from ignoring PTSD altogether, he talked to Leitner about it and "looked at it to see if we could use it as a defense," but concluded that it would not be successful.

The primary consideration behind Black's trial attorneys' strategic decisions concerning investigation and presentation of mitigating evidence was the ability of any such evidence to negate the second special issue. In light of their ultimate goal of obtaining a "no" answer to the question whether Black was likely in the future to commit criminal acts which would pose a continuing threat to society, the decision to avoid presenting evidence of a syndrome which is frequently associated with violent outbursts must be deemed reasonable. As Scott testified, the theory at the penalty phase was to present the jury with a large amount of information about Black's good qualities in order to show that the killing of Sandra was a once-in-a-lifetime event which would not be repeated by a man whose earlier life had been exemplary. Evidence that Black suffered from PTSD would, in Scott's judgment, have been detrimental because the jury might connect the violent act of killing Sandra with a tendency to commit acts of violence in the future. Black's suggestion that Scott thought PTSD did not "fit the facts of the case" because Scott had failed to familiarize himself with Black's history of PTSD is simply unsupported by the record; Scott made the strategic decision to avoid evidence which might show future violence with sufficient knowledge of the nature of Black's affliction. The reasonable professional judgment that Black's defense should not center on evidence of his psychological condition, which necessarily would have included evidence of violent outbursts, thus supported Scott and Swim's reluctance to conduct further investigations of Black's psychological condition.

Black's citations to *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir.1990), and *Proffitt v. Waldron,* 831 F.2d 1245 (5th Cir. 1987), do not help him. In *Bouchillon,* the defendant apprised his counsel of his mental problems, but counsel failed to investigate the defendant's competency prior to representing him at a plea hearing. Given that insanity represented the only possible

---

**7.** Black faults the district court for appearing to base its entire opinion on the view, unsupported by the evidence, that Black's conduct was in no way connected to PTSD. While we agree that such a finding would be unsupported by the evidence at the state habeas hearing, we do not think the district court's opinion can fairly be read as relying solely on this erroneous finding. Toward the end of its analysis of this issue, the court appears to have held that Black's attorneys' decision to keep evidence of PTSD away from the jury was reasonable in light of the negative impact that such evidence could have had on the jury's consideration of Black's future dangerousness. Dist.Ct.Op. at 7.

Black also focuses on the district court's statement that PTSD "may in some sense explain his behavior, but it in no sense justifies it." Dist.Ct. Op. at 7. Although it is unclear what the district court had in mind in making this statement, we do not think it fatally infected the court's ultimate conclusion that Black did not receive ineffective assistance of counsel.

defense, and that his present competency was an issue, the failure to perform any investigation whatsoever was deemed unreasonable. *Bouchillon,* 907 F.2d at 596–97. In *Profitt,* the defendant had been adjudicated insane by an Idaho court and ordered committed. He escaped and committed a crime in Texas. Prior to the trial, he underwent psychiatric examinations which resulted in findings that he was competent to stand trial. His attorneys knew he had escaped from a mental institution, but made no effort to investigate the reason he had been committed. They therefore presented no insanity defense. *Profitt,* 831 F.2d at 1249. In both of these cases counsel was presented with information which, if pursued, would have led to the discovery of evidence supporting real defenses to the criminal charges. Black's attorneys, by contrast, were presented with enough information to enable them to make reasonable professional judgments without further investigation. Any additional evidence about Black's suffering from PTSD or other disorders that they might have uncovered would not have changed their decision not to volunteer to the jury any aspects of Black's violent nature. We conclude, therefore, that Black has not succeeded in establishing that his counsel's decisions were unreasonable as required by *Strickland.*

D. *Consideration of Mitigating Evidence Under the Texas Capital Sentencing Statute*

■ During the punishment phase of trial, Black adduced evidence relating to his activities as a youth, including his accomplished participation in Boy Scouts and other school-related achievements, and his enlistment in the Marines and military service record.[8] The evidence relating to good character after his return from Vietnam included his exemplary work record and his involvement in the Boy Scouts as an Assistant Scout Master.[9] The evidence of his good conduct during youth, Black argues, overshadowed the comparatively meager evidence relating to good character after his return from service in Vietnam. Black contends that the disparity in the amount of evidence arising from the two time periods made it obvious to the jury that military service had changed him. Consequently, he asserts that the Texas sentencing scheme prevented the jury from giving full mitigating effect to the evidence of his youthful conduct because, absent a special instruction, the dearth of evidence showing his good character after service in Vietnam required the jury to find that Black posed a continuing threat to society.

The Supreme Court held in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), that a Texas capital jury requires special instructions when the mitigating evidence presented by the defendant "has relevance to his moral culpability beyond the scope of the special issues." *Id.* at 322, 109 S.Ct. at 2948. In *Graham,* we recently interpreted *Penry* as requiring special instructions only when the "major mitigating thrust of the evidence is substantially beyond the scope of all the special issues." *Id.* at 1027. We also considered whether *Penry*'s holding extended to the good character evidence presented by the petitioner and determined that it did not. The principal mitigating thrust of *Graham's* good character evidence was to suggest that his conduct during the commission of the capital crime was "atypical of [his] true character and that he thus had potential for rehabilitation, and would not be a continuing threat to society." *Id.* at 1032. Accordingly, while we noted that "good character evidence provides no variety of 'excuse,'" *id.* at 1033, we concluded that the jury could adequately give mitigating effect to this evidence under the second special issue. *Id.* at 1032.

---

**8.** After he completed basic training, Black was honored as the finest Marine in the battalion. In six years of enlistment, Black rose through the ranks from private to captain.

**9.** A witness whose son participated in the Boy Scouts under Black's leadership testified that as an Assistant Scout Master, Black was particularly supportive of the boy, who suffered from chronic depression.

Black suggests that his good character evidence differs from that considered in *Graham* because extensive evidence of positive character traits was added to evidence of wartime military service and unexplainable behavior following his return from Vietnam. The concomitant effect of this evidence, Black maintains, prevented the jury from considering the evidence of good character from his youth in the manner suggested by *Graham.* We disagree. While more of Black's good character evidence related to his conduct before Vietnam, the jury also had before it testimony relating to several incidents that demonstrated his good character after his return from Vietnam. Black presented no evidence to show that he suffered from a permanent emotional or mental impairment arising from his military service in Vietnam. Absent such evidence, the mitigating thrust of all of Black's good character evidence, relating to conduct both before and after his military service, was to show his potential for rehabilitation and that he would not pose a continuing threat to society.[10] As a result, although the jury was free to consider the fact that Black presented fewer recent instances of good conduct in determining whether his criminal act was aberrational, the difference in the amount of evidence addressing each time period did not shift the mitigating emphasis of the pre-Vietnam evidence in a way that left it unaddressed by the special issues. Therefore, we find this contention lacks arguable merit.

E. *Sixth Amendment Right to Counsel*

■ Black argued to the district court that his Sixth Amendment right to counsel was violated when Grady Deckard, a cellmate who was allegedly acting as an agent of the State, testified about statements he had deliberately elicited from Black after Black had been indicted.[11] This claim arises entirely from Deckard's testimony at the state hearing. At trial, Deckard had testified that Black discussed escape plans and that he (Deckard) had reported this to Ron Huddleston, an official at the Brazos County jail. Huddleston then placed Deckard back in the same tank with Black and asked him to obtain further information, but Black made no further statement. At the state hearing, however, Deckard testified that his earlier testimony had been false and that Huddleston had in fact asked Deckard to obtain incriminating statements from Black *before* Black discussed the escape.

The district court did not analyze the question whether Black's Sixth Amendment rights had been violated, but held that, even if Deckard was an agent of the State, his testimony was merely cumulative of Huddleston's testimony that a map of the jail had been found in Black's cell. Although the district court should have resolved this issue by reference to the state court's findings, *see* Dist.Ct.Op. at 8, it reached the correct result. Black's theory that Deckard became an agent of the State before he obtained any statements fails for two reasons. First, it is based on letters written by Deckard to his attorney which were excluded from evidence by the state court. As stated in note 4 above, the court's exclusion of these letters was solidly grounded in the premise that they were hearsay. The state court's finding that "Grady Deckard first approached, and vol-

---

10. For a juror to consider the evidence in the manner Black suggests would require the juror to speculate that Black's experience in Vietnam led him to suffer some permanent emotional or mental disability. We will not consider such a claim. *See Barnard v. Collins,* 958 F.2d 634, 638 & n. 5 (5th Cir.1992) (citing *Wilkerson v. Collins,* 950 F.2d 1054, 1061 (5th Cir.1992), *petition for cert. filed,* No. 91–7669 (U.S. Mar. 18, 1992)); *see also White v. Collins,* 959 F.2d 1319, 1322 (5th Cir.1992) ("*Graham v. Collins* makes it clear that *Penry* does not require that a sentencer be able to give effect to a defendant's mitigating

evidence in whatever manner or to whatever extent the defendant desires.").

11. Deliberate elicitation by a state agent of incriminating statements from an uncounseled defendant whose right to counsel has attached is a violation of the Sixth Amendment. *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

untarily told Ron Huddleston, Jail Administrator for the Brazos County Jail, that [Black] had discussed plans to escape from the Brazos County Jail" is supported by the evidence adduced at the hearing and is entitled to deference under § 2254(d), as is the finding that "[n]o additional information regarding [Black's] escape plan was learned after Ron Huddleston put Grady Deckard back into [Black's] tank."

Second, the state court found that Deckard's testimony at the evidentiary hearing was not credible. Black has not indicated any reason why Deckard's recantation should not be treated with the usual degree of skepticism accorded recanting witnesses. *See United States v. Adi*, 759 F.2d 404, 408 (5th Cir.1985). Huddleston's testimony at the hearing that Deckard voluntarily told of Black's escape plans was consistent with Deckard's having told the truth at the trial. The only evidence to which Black can point to establish that Deckard testified truthfully at the evidentiary hearing is Deckard's letters. This evidence no more undermines the state court's finding that Deckard was not credible than it does the findings described above. Accordingly, Black has failed to show the factual predicate for a Sixth Amendment violation.

**F. Giglio *Claim***

■ Black next argued to the district court that the prosecution did not reveal the existence of a deal it made with Grady Deckard in exchange for his testimony about Black's escape plans. Black alleged that the State gave Deckard a reduced plea agreement to his own pending attempted murder charges. Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a defendant may establish a due process violation if he shows that the prosecution suppressed evidence favorable to the accused and the evidence is material either to guilt or punishment. *Id.* at 87, 83 S.Ct. at 1196; *see Smith v. Black*, 904 F.2d 950, 963 (5th Cir.1990), *vacated in part on other grounds*, ── U.S. ──, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992). The principles of *Brady* apply to the nondisclosure of a promise of nonprosecution made in exchange for witness testimony. *Giglio v.*

*United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *see also United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

The district court held that (1) the weight of the evidence does not show that Deckard received undisclosed consideration and (2) if the State's failure to disclose a deal was error, it was harmless. Dist.Ct.Op. at 9. We agree with the first of these holdings—because the state court found as a fact that information about Black given by Deckard to his attorney, Brooks Cofer, "was not used in the plea negotiations according to Mr. Cofer" and "[n]egotiations between the State and the defense regarding the disposition of Grady Deckard's cases began in April, 1986, after [Black's] trial had concluded." Black attacked the state court findings mainly by reciting the sequence of events surrounding Deckard's plea agreement: First, relying on the District Attorney's file which was excluded from the evidentiary hearing, Black contended that Deckard was offered the ten year sentence for the burglary for which Deckard was on probation when he committed the attempted murder. Then, relying on the letters to Cofer which were excluded, Black implied that Cofer used Deckard's cooperation as part of the plea negotiations. Finally, Black pointed to the fact that after the trial, Deckard confessed to the attempted murder, received a five year prison sentence on the original burglary charge, and was never prosecuted for attempted murder.

The difficulty with this is that it does not show that the state court's findings were unsupported by the record. It does not necessarily point to the existence of a deal which the prosecution would have been obliged to divulge. Significantly, Cofer did not recall the plea negotiations in Deckard's case, and the documents which Black uses to establish the initial ten-year deal were never admitted into evidence. Thus, there is simply no support for Black's conclusion that Deckard's five year sentence was the result of his agreement to testify against Black. Nor has Black offered any evidence which would detract from the

state court's finding that Deckard's elevation to "trustee" status in the Brazos County Jail was not due to his agreement to testify. As with the Sixth Amendment claim, Black has failed to establish the factual predicate for a *Giglio* claim.

### G. *Falsity of Deckard's Testimony*

■ Black contended in the district court that Deckard's testimony at trial was false and that it deprived Black of due process of law. "The Fifth Circuit has long abided by the standard requiring that for use of perjured testimony to constitute constitutional error, the prosecution must have knowingly used the testimony to obtain a conviction. *Mooney v. Holohan,* 294 U.S. 103, 110, 112, 55 S.Ct. 340, 341, 342, 79 L.Ed. 791 (1935) (per curiam); *Hawkins v. Lynaugh,* 844 F.2d 1132, 1141 (5th Cir.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988)." *Smith,* 904 F.2d at 961 (additional citations omitted). Black has not suggested that the prosecution knew Deckard's testimony was false. Accordingly, this claim must fail.

### H. *Interference of the Texas Capital Sentencing Scheme With Counsel's Presentation of Evidence*

■ Black argued to the district court that the structure of the Texas capital sentencing scheme "interfered in certain ways with the ability of counsel to make independent decisions about how to conduct the defense," *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063, thus violating his Sixth Amendment right to counsel. He contended that counsel was hindered from presenting evidence of hospitalizations, depression following his return from Vietnam, diagnosis with PTSD and other mental disorders, and other difficulties.

We rejected an identical claim in *May v. Collins,* 948 F.2d 162 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 808 (1992). There the petitioner, citing the principles drawn from *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), and *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), that effective assistance may be denied by a state statute which restricts the presentation of a defense, argued that "the structure of the Texas sentencing statute so forced his attorney's tactical decision on whether to present mitigating evidence as to result in a constructive denial of the effective assistance the Sixth Amendment contemplates." *May,* 948 F.2d at 167. Black's argument, like that of May, is premised on the principle of *Brooks* and reads as follows: "The Texas sentencing procedure interferes dramatically with the defendant's choice of whether and how to present mental-health based evidence."

We reasoned in *May* that counsel's tactical decisions in sentencing proceedings, including capital proceedings, "are always channelled by the requirements of the statute under which the state proceeds." 948 F.2d at 167. A rule under which a defendant could show a Sixth Amendment violation simply because the statute triggers certain tactical decisions would lead to limitless claims of ineffective assistance. We did not consider the kind of interference contemplated in *Brooks* and *Herring* applicable to the Texas capital sentencing statute. *Id.* at 167–68. *May* squarely addressed the issue presented by Black, so this claim cannot succeed.

### I. *Evidence of Unadjudicated Extraneous Offenses at the Penalty Phase*

■ At the punishment phase of trial, the State proffered evidence to show that Black (1) solicited several individuals to kill the husband of his cousin; (2) assaulted his wife on one occasion; and (3) while armed, chased his mother-in-law from his home. Black argued to the district court that the admission of these unadjudicated extraneous offenses deprived him of protections guaranteed by the Eighth and Fourteenth Amendments. The Court of Criminal Appeals, considering this claim in Black's state habeas petition, determined that Black's failure to object to the admission of this evidence during the punishment phase procedurally barred him from raising this claim.

The Court of Criminal Appeals unambiguously expressed its reliance on a state procedural bar in dismissing the claim. *See Harris v. Reed,* 489 U.S. 255, 262–63, 265, 109 S.Ct. 1038, 1042–43, 1044, 103 L.Ed.2d 308 (1989). Black failed to show cause for the default and actual prejudice resulting therefrom. *See Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 2643, 91 L.Ed.2d 397 (1986). Nor did he make a showing of actual innocence in order to avoid the cause and prejudice requirement. *See id.* at 496, 106 S.Ct. at 2649. Accordingly, Black does not avoid the procedural bar that prevented the district court from entertaining this claim.

### J. *Victim Impact Statements*

█ Black contended before the district court that, during both the guilt and punishment phases of his trial, the court permitted the prosecution to present impermissibly inflammatory and prejudicial evidence and argument concerning the character and worth of the deceased, and the effect of her death on others. He argued that the admission of this victim impact evidence deprived him of the right to a fundamentally fair trial guaranteed by the Fourteenth Amendment. On state habeas review, the Court of Criminal Appeals adopted the state trial court's conclusion that Black was procedurally barred from complaining of the State's closing argument to the jury for failure to object at trial. Because this statement arguably fails to address whether Black defaulted his claim as it relates to both the guilt and punishment phases of his trial, we consider whether the claim has arguable merit.

In *Payne v. Tennessee,* —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court declared that "[i]n the majority of cases, ... victim impact evidence serves entirely legitimate purposes," *id.,* 111 S.Ct. at 2608, and, accordingly, that "[a] State may legitimately conclude that evidence about the victim and about the

impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 2609. It held that victim impact evidence did not overstep the bounds of the Fourteenth Amendment unless the evidence introduced "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 2608. The Court also reasoned that, in the same way that a defendant is permitted to introduce relevant mitigating evidence, the State may allow the prosecutor to "argue to the jury the human cost of the crime of which the defendant stands convicted." *Id.* at 2609.

Black asserted that the victim impact evidence presented in his case rendered his trial fundamentally unfair because it constituted a strong emotional appeal to the jury to sentence him to death precisely because Sandra Black was a hard-working, devoted wife and mother. However, the record does not demonstrate that the evidence or the prosecutor's statements were so inflammatory as to deprive Black of a fundamentally fair proceeding. The evidence bore upon the effect of Sandra Black's death on her son [12] and mother, and sought to "remind[ ] the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique death to society and in particular to [her] family." *Id.* at 2608 (quoting *Booth v. Maryland,* 482 U.S. 496, 517, 107 S.Ct. 2529, 2540, 96 L.Ed.2d 440 (1987) (White, J. dissenting)). Both of these showings are permissible. As a result, the district court correctly concluded that this claim lacked arguable merit.

### K. *Change of Venue*

█ Finally, Black argued to the district court that the trial court's failure to grant his motion for a change of venue violated his rights under the Sixth and Fourteenth Amendments to a fair trial before an impartial tribunal.[13] Pointing to

---

**12.** The prosecutor commented, "I doubt that you would be surprised to find out that this young man has been at counseling after this."

**13.** Although Black did not raise this claim in the state habeas proceedings, he raised it on direct appeal. *Black v. State,* 816 S.W.2d 350, 358–59 (Tex.Crim.App.1991).

media coverage in Brazos County about the crime, much of it sensationalized, as well as the opinion of witnesses from the Bryan–College Station area who testified at the venue hearing about the community's knowledge of the crime, he contended that pretrial publicity was so prejudicial that he could not get a fair trial in Brazos County. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The district court held that Black did not sustain his burden of showing that the trial atmosphere was "utterly corrupted by press coverage," as required under *Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Dist.Ct.Op. at 12.

We agree with the district court's assessment. The Constitution does not require that jurors be completely unaware of the facts and issues to be tried, *id.* at 302, 97 S.Ct. at 2302, and the record developed at the venue hearing does not reveal such extensive media coverage of the details of the case as was present in *Irvin* or *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

### III.  CONCLUSION

In summary, we do not believe that Black has demonstrated that the issues raised in his petition for habeas relief are debatable among jurists of reason, nor do we think that the questions there raised deserve encouragement to proceed further. We therefore DENY Black's application for a certificate of probable cause and his motion for a stay of execution.